KOONS et al. v. LA FONCIERE COMPAGNIE D'ASSURANCES.

(District Court, N. D. California. January 10, 1896.)

No. 11,067.

1. MARINE INSURANCE—SALVAGE LOSS.

An insurance company issued a policy on 500 cases of salmon, shipped as part of a general cargo from Portland, Or., to New York, the policy containing a provision that the merchandise was warranted by the insured free from particular average and partial loss, unless occasioned by stranding, etc., or other peril insured against, and amounting to 50 per cent. or more on the sound value of the shipment at the port of delivery, all such loss to be settled on the principles of salvage loss, with benefit of salvage to the insurers. The vessel was damaged in a storm, and obliged to put into San Francisco, where 392 of the 500 cases of salmon were found to be so damaged as to be unfit for transportation to New York, and were sold by the master. Treating the 392 cases, at the valuation per case in the policy, as a total loss, such loss amounted to more than 50 per cent. of the sound value of the shipment at New York; but, if treated as a partial loss, deducting from the valuation the net proceeds of the sale at San Francisco by the master, the loss was less than 50 per cent. of such sound value. *Held*, that the loss, occasioned by damage to the ship and cargo and the consequent forced sale in San Francisco, was a salvage loss.

2. SAME—CONSTRUCTION OF POLICY.

*Held*, further, that it was not intended, by the provision in the policy excepting losses under 50 per cent., to make a distinction between the principles of ascertainment and of settlement of such losses, but the same were to be both ascertained and settled on the principle of salvage loss, treating the whole value of the goods as the amount of the loss, and allowing the insurer the benefit of the salvage or net proceeds, and, accordingly, that the insurer was liable.

Libel to recover $1,110.80 on a policy of insurance, covering a shipment of 500 cases of salmon on the bark Belle of Oregon on a voyage from Portland, Or., to New York. Decree for libelants in the sum sued for.

Page & Eells, for libelants.

Andros & Frank, for respondent.

MORROW, District Judge. The libel in this case was filed against the above-entitled insurance company to recover the sum of $1,110.80, alleged to be a balance due on a policy of insurance covering a shipment of 500 cases of salmon. The case was submitted on an agreed statement of facts, which, omitting a few unimportant details, is as follows:

"On the 8th day of July, 1892, said company, for a valuable consideration, issued and delivered to Messrs. Hapgood & Co., of Portland, Oregon, loss, if any, payable to their order, on account of concerned, its policy of insurance, whereby it insured three thousand dollars upon five hundred cases of salmon, valued at said sum, laden or to be laden under deck on board the bark Belle of Oregon, lost or not lost, at and from Portland, aforesaid, to New York. * * * As part of a general cargo, said 500 cases were thereafter laden on board of said vessel, which in due course, about the 7th day of August, 1892, sailed on the said voyage. The vessel encountered a severe storm, which partially dismantled her, and caused a leak, compelling her

master to seek the port of San Francisco as a port of distress. She arrived, at San Francisco September 21, 1892. Her cargo was partially discharged, and it was found that part of it was badly damaged, and incapable of standing transportation to New York. For the benefit of all concerned, it was sold by the master at public auction. Three hundred and ninety-two cases of the salmon insured by the policy hereunto annexed were thus sold. The gross proceeds of the sale were $1,415.84, and the net proceeds thereof, after deducting the expenses of surveys, cost of sale, and other charges, were $1,341.50. The Belle of Oregon was repaired at San Francisco, and resumed her voyage, arriving in New York about the 18th day of March, 1893. On discharge of her cargo it was found that forty-three cases of the insured salmon were damaged by perils insured against to the extent of 35 per cent., the remaining sixty-five cases being delivered in good order. The sound market value at New York at that time of the insured salmon was $6.80 per case. The insured value was $6 per case, and the expense of appraising the damage was $10. Upon delivery of the cargo at New York, and ascertainment of the damage to the salmon delivered there, the libelants, to whose order Hapgood & Co. had made the loss, if any there should be, payable, presented to the defendant their demand for $2,452.30, as a loss under said policy under the third clause thereof, claiming that the sale of 392 cases at San Francisco by the master constituted a loss which, added to the damage sustained by the cases delivered at New York, made a loss of 50 per cent. or more upon the sound market value of the whole shipment at the port of delivery. The respondent refused to entertain said demand, claiming on its part that under the provisions of the said clause the libelants were not authorized to add the market value at New York of the cases of salmon sold at San Francisco to the damage found in the forty-three cases delivered in New York, amounting to $102.34, for the purpose of making a fifty per cent. loss; and that, in order to make a claim properly a charge under the policy, the loss or damage on the cases delivered at New York, added to the loss on the goods sold at San Francisco, such loss to be ascertained without deducting cost of sale, survey, or other charges from the gross proceeds of sale, must be equal to fifty per cent. or more of the sound market value of the whole shipment at New York. After making this demand, the libelants, accepted from the master of the ship the net proceeds of the sales made at San Francisco, amounting to $1,341.50. Such acceptance was made without prejudice to the claim, except to the extent of the said amount, against the respondent. The amount now claimed to be due from the respondent, after crediting the sum paid by the ship, is $1,110.80. * * *"

The policy in question is made a part of the statement of facts. The duration clause of the policy is as follows:

"Beginning the adventure upon the said property or interest from and immediately following the loading thereof on board said vessel as aforesaid, and so shall continue and endure until said property or interest shall be safely landed as aforesaid."

The risks covered by the policy are described as follows:

"Touching the adventures and perils which this insurance company is contented to bear and takes upon itself in this policy, they are of the seas, fires, pirates, assailing thieves, jettisons, barratry of the master or mariners (unless the insured be owner or part owner of the vessel), and all other losses and misfortunes that have or shall come to the hurt, damage, or detriment of said property or interest, to which insurers are liable by the rules and customs of insurance in San Francisco; embezzlement and illicit trade excepted in all cases, and also excepting such losses and misfortunes as are excluded by this policy."

With respect to the losses and misfortunes excluded by the policy, the third clause contains the following provision:

"Unless otherwise specified herein, all merchandise not excepted under the following memorandum clause is hereby warranted by the insured free from

particular average and partial loss, unless occasioned by stranding, sinking, fire, collision, or other extraordinary peril hereby insured against, and amounting to fifty per cent. or more on the sound value of the whole shipment at the port of delivery; and all such loss shall be settled on the principles of salvage loss with benefit of salvage to the insurers."

The libelants contend that the loss sustained by the forced sale of the 392 cases of salmon at San Francisco was what is known in the law of marine insurance as a "salvage loss," and that the clause of the policy just quoted contemplates that the principles peculiar to salvage losses should be followed in determining whether the loss sustained amounts to 50 per cent. on the "sound value of the whole shipment at the port of delivery." The respondent contends: That by the terms of the policy two things are contemplated: First, the ascertainment of the loss; and, second, a method of settling the loss when ascertained. That, with respect to the ascertainment of the loss, the respondent, if liable at all, must be so under the provisions of the policy relating to a particular average loss, for the reason that the third clause of the policy provides that all merchandise not included in the memorandum clause is "warranted by the assured free from particular average and partial loss, unless occasioned" by perils insured against, "and amounting to fifty per cent. or more on the sound value of the whole shipment at the port of delivery." It is claimed by the respondent that this provision, relating to a partial loss, necessarily excludes all consideration of a salvage loss, and that it is only with respect to the settlement of the loss after it has been thus ascertained that the principles of a salvage loss enter into the contract under the provision that "all such loss shall be settled on the principles of a salvage loss, with benefit of salvage to the insurers." The respondent further contends that a salvage loss is excluded by the terms of the clause in question, for the reason that the partial loss for which the insurer is liable is based upon 50 per cent. of the sound value of the whole shipment at the port of delivery, and not on the valuation in the policy, upon which a salvage loss is to be ascertained; and that, as the principal element of a salvage loss is excluded, the loss itself is also excluded.

The question in controversy is, therefore, the determination of the character of the loss sustained by the forced sale of the 392 cases of salmon at San Francisco. If it is treated as a salvage loss sustained by reason of a peril insured against, and the insurer required to pay as for a total loss of the whole of the damaged merchandise sold, receiving the proceeds of the sale, and paying the insured the difference between the insured value and the net proceeds of the sale, adding the damage sustained by the cases delivered at New York, this method of adjustment will make a partial loss of more than 50 per cent. on the sound market value of the whole shipment at the port of delivery, and the respondent will be liable on the policy, and the libelant entitled to recover in this action. If, on the other hand, the loss is treated and settled on the principles of a particular average, and the net proceeds of the sale at San Francisco are first deducted from the gross loss sustained, and this remainder added to

the damages sustained by the cases delivered at New York, then the loss will be less than 50 per cent. on the sound value of the whole shipment at the port of delivery, and the respondent will not be liable on the policy, and the libelant not entitled to recover. The principles involved in the former method of adjustment are peculiar to what is known in the law of marine insurance as a salvage loss, and are explained by Stevens, in his work on Average, as follows:

"A salvage loss (from which this mode of adjustment is derived) is that kind of loss which it is presumed would, but for certain services rendered and exertions made, have become a total loss. The charges incurred are called 'salvage charges'; the property saved is 'the salvage,' and the difference between the amount of the salvage (after deducting the charges) and the original value of the property is called 'the salvage loss.' In general, a salvage loss of goods is when, in consequence of shipwreck or the perils of the sea, the vessel is prevented from proceeding on her voyage, and the cargo, or the part that is saved, is obliged to be sold at a place short of the port of destination. In such cases, though the property be not abandoned to the underwriters, the principle of abandonment is assumed, and is, in fact, acted upon. The property saved does not, indeed, actually belong to the insurers, as where a regular abandonment is allowed, but it is to all intents and purposes treated as if it did, and all the charges incurred are borne by them. The principle acted on is this: The underwriter pays a total loss, and takes the proceeds of the goods. Both in the abstract and in practice this mode of adjustment appears but ill calculated to give the merchant his indemnity in case of partial loss on goods by their being sea-damaged; and, accordingly, there is but one case that can justify a claim of this nature being calculated on the basis of a salvage loss. This case is as follows: When a ship, on her voyage, puts into an intermediate port in distress, to refit, etc., and on unloading the cargo it is discovered that some of the goods are damaged, which, to prevent further deterioration, are surveyed and sold on the spot. In such a case the claim must be adjusted as a salvage loss, and all the charges must be borne by the insurers, for no particular average claim, according to the definition above stated, can be made up when the goods are sold at any other place than the port of destination. Here the damaged goods are really (not, as the term is often misapplied) sold on account of the underwriter, he paying all the charges, and even the freight, and the merchant is indemnified as for a total loss; e. g. he receives the net proceeds from the person who effects the sale, and the balance from the underwriter."

As defined in 2 Phil. Mar. Ins. § 1480, it is as follows:

"Under an adjustment of the loss on damaged goods sold at an intermediate port, being a part only of the goods insured by the policy, the underwriters are liable, as we have seen, for the whole loss, enhanced by freight, duties, wharfage, and storage. This is a salvage loss, so denominated because the insurer, as in a total loss, pays for the whole value of the subject, and is entitled to the salvage, or net proceeds of the sale of it, after the deduction of all expenses. In a salvage loss there is no transfer of the salvage to the underwriters, as by abandonment in total loss. The salvage belongs to the assured, and he credits the underwriter with the amount of it in the adjustment. The underwriter is liable for such an adjustment of a particular average only in cases where the sale at an intermediate port is obviously expedient, and made on account of damage by the perils insured against, where, if the subject were forwarded to the port of destination, it would be greatly diminished in value, or be of no value, on arriving there."

See, also, MacArthur, Ins. p. 204; 2 Arnould, Mar. Ins. (5th Ed.) 897.

. ' In the present case the vessel was compelled, by the perils of the sea, to put into the port of San Francisco for repairs. Upon unloading the cargo, it was discovered that 392 cases of salmon were in such a damaged condition, through the leaking of the vessel,—a peril insured against,—that they were, in the language of the agreed statement of facts, "incapable of standing transportation to New York." They were, therefore, sold by the master at public auction, for the benefit of all concerned. The gross proceeds of the sale were $1,415.84; the net proceeds were $1,341.50. Treating the loss to the assured as total, according to the principles of a salvage loss, it would amount, at $6 per case, the insured value, to $2,352. The sound value at New York of 500 cases at $6.80 per case, the agreed market valuation, would amount to $3,400, and 50 per cent. thereof to $1,700. As $2,352 exceeds $1,700, it is more than 50 per cent. of the sound value of the whole shipment at the port of delivery, and under the terms of the policy the assured becomes entitled to recover for the loss he has sustained. There can be no doubt that, if the rule which obtains in adjusting a loss as a "salvage loss" is applied at all in this case, it leads to the result indicated. The loss is treated as a total loss. It is calculated upon the theory that it is total so far as the assured is concerned; but in the settlement the assured is given credit for the net proceeds of the sale, after deduction of all the expenses of sale. 2 Phil. Mar. Ins. § 1480. The same result, so far as the amount to be paid by the insurer is concerned, would be attained if he should keep the proceeds of the sale, and pay as for a total loss. Whatever additional loss was sustained by the 43 cases which arrived in New York damaged to the extent of 35 per cent. would, clearly, under this rule, only add to the excess over 50 per cent. Therefore, so far as the facts are concerned, the loss to the 392 cases comes clearly within what is known in the law of marine insurance as "salvage loss." Although they were not totally destroyed, yet they were as effectually a total loss to the assured as if they had been thrown overboard, for they never reached their port of destination. It was a total loss, to all intents and purposes, of nearly four-fifths of the whole shipment. The risk which the insurer assumed by his policy was for "losses and misfortunes that have or shall come to the hurt, damage, or detriment of the said property or interest," etc., and was to endure "until said property or interest shall be safely landed at New York." The 392 cases never reached New York. It is true that they were sold at an intermediate port, but they were so sold because they were incapable of standing transportation, and under this state of facts it is reasonable to presume that, had they been reshipped, they would have arrived a total loss. Although, in their damaged condition, they netted a sum of money which, however, was less than their insured value, yet the receipt of a certain sum of money derived from the forced sale of damaged goods at an intermediate port is not equivalent to the arrival of the goods, nor does it indemnify the assured for his loss. Moses v. Insurance Co., 6 Johns. 219, 224. But,

whatever might be the conclusion which the court would reach if the general principles of marine insurance law were applied to the facts of this case, the rights of the parties grow out of, primarily, and must depend upon, the contract of insurance which was entered into between them. We will therefore now direct our attention to the terms of the policy.

Counsel for respondent contends that clause 3 of the policy excludes a "salvage loss." That part of the clause which provides a method or the principles to be employed in settling a particular average or partial loss reads: "And all such loss shall be settled on the principles of salvage loss, with benefit of salvage to the insurers." But it is to be observed that, with certain exceptions, including a partial loss less than 50 per cent. on the sound value of the whole shipment at the port of delivery, as provided in this clause, the policy covers all loss sustained by perils insured against, whether the damaged goods reached their port of destination, or, as in the case at bar, they be sold of necessity at some intermediate port. In interpreting a contract of insurance, two cardinal canons of interpretation are to be constantly kept in mind. The first is that the professed object of insurance is to indemnify the assured in case of loss. Generally speaking, this is accomplished by "putting the merchant in the same condition which he would have been in if the goods had arrived free from damage." Stev. Av. p. 295. The second is that any ambiguity in the contract of insurance is to be construed most strongly against the insurer and in favor of the assured. 1 Arnould, Mar. Ins. (6th Ed.) 295. In Yeaton v. Fry, 5 Cranch, 335, Chief Justice Marshall thus expressed the principle underlying this rule of interpretation: "The words are the words of the insurer, not of the insured; and they take a particular risk out of the policy, which, but for the exception, would be comprehended in the contract." In National Bank v. Insurance Co., 95 U. S. 673, 679, Mr. Justice Harlan said: "It is its [the company's] language which the court is invited to interpret, and it is both reasonable and just that its own words should be construed most strongly against itself." See, also, Steel v. Insurance Co., 2 C. C. A. 463, 51 Fed. 715, 723, and cases there cited. The distinction sought to be made by counsel for respondent between the ascertainment of the loss and the settlement of the loss, claiming that it is only after the loss is ascertained that it is to be settled according to the "principles of a salvage loss," I do not think sound or tenable. He admits that the loss, when once ascertained, is to be settled on the principles of a salvage loss. This admission, it seems to me, concedes the very proposition contended for by counsel for libelants. Nothing is said in clause 3 about first ascertaining the loss according to the principles which obtain in adjusting a particular average, and then settling such loss so ascertained according to the principles of a salvage loss. To hold that such was the intention of the parties would, in my opinion, be giving a strained and unreasonable meaning to this clause. It is but reasonable to presume that, if the parties

had intended to pursue such a course, that intention would have been expressed and referred to in some intelligible and positive way. That such a course was not contemplated by either side at the time the contract of insurance was entered into is, I think, not open to serious question. I take it that the provision here involved means exactly what it says, viz. that all such loss (meaning a loss insured against) "shall be settled on the principles of salvage loss, with benefit of salvage to the insurers." The expression "shall be settled" was undoubtedly intended to comprehend the whole process of ascertaining and adjusting the extent of the loss. The only qualification upon a recovery is that the particular average and partial loss must amount to 50 per cent. on the sound value of the whole shipment at the port of delivery. Even if there were a doubt as to what was the real meaning of the verbiage employed, assuming it to be ambiguous, I should, guided by the rule of interpretation announced above, be compelled to adopt that construction most favorable to the assured; that is, to treat the loss as a salvage loss, ascertaining the 50 per cent. as if it were for a total loss of the 392 cases sold at San Francisco, and whatever salvage there might be inuring to the benefit of the insurer, as is expressly provided by the clause in question. In this way the assured is indemnified for whatever loss he actually sustained. The insurer, on the other hand, is in no wise prejudiced in any right he had under the policy by this method of settlement. He gets the full benefit of the salvage, and thus complies with the requirements of his contract, for which he has received his premium. He agreed to pay the assured for any particular average and partial loss sustained by a peril insured against, should such loss amount to 50 per cent. or more on the sound value of the whole shipment at the port of delivery. If the loss is treated as a salvage loss, it does amount to more than 50 per cent. On the other hand, if it should be held that the insured is not entitled to recover, adopting the contention of counsel for respondent, he would only get the net proceeds of the forced sale of the 392 cases, amounting to $1,341.50, and would have to stand the remainder of the loss. Such a method of adjustment would be grossly inequitable to the assured, and would be in utter disregard of the principles of the salvage loss.

There is another reason, which indicates conclusively to my mind that the 50 per cent. adjustment was to be made on the whole or gross loss, as in a salvage loss, and not on the net loss, and that is the distinct provision that the benefit of salvage should inure to the insurers. How, then, can it be claimed that the net proceeds of the sale of the 392 cases at San Francisco should first be deducted from the gross loss there sustained, if the insurers are to get the benefit of these proceeds? The manner in which he gets this benefit is immaterial. Whether he keeps the proceeds, and pays as for a total loss, or whether he allows the assured to take the proceeds, and credits him with the sum in paying as for a total loss, is manifestly unimportant, so far as the result is concerned. Whichever method be resorted to,

the insurer gets the full benefit of the salvage. If this be the correct method of settling the loss suffered by the assured, of which I have no doubt, the settlement, reduced to figures, would read as follows:

Loss, 392 cases, sold of necessity at San Francisco, valuation in the policy (as set out in the agreed statement of facts) $6 per case... $2,352 00
Loss, 35 per cent. on 43 cases at $6, which arrived in a damaged condition at New York.............................................. 90 30

Entire loss ................................................................. $2,442 30
—which sum exceeds 50 per cent. of the sound value of 500 cases at New York at $6.80 per case, viz. $3,400, or one-half, $1,700.
The loss being ascertained to be a 50 per cent. loss, then, under clause 8, cost of appraisement is borne by the company. This cost (per the agreed statement of facts) is.......................... 10 00

Total ...................................................................... $2,452 30
Crediting the company with the net proceeds of the sale at San Francisco (without prejudice to the balance of its claim, as per agreement) .................................................................. 1,341 50

Balance due assured...................................................... $1,110 80
—which is the amount sued for.

The case of Moses v. Insurance Co., 6 Johns. 219, seems to be directly in point. That was an action on an open policy of insurance on 300 barrels of flour, laden on board of the ship Herkimer, for a voyage from New York to London. While on the voyage tempestuous weather was encountered, and, having sprung a leak, which increased so as to render it necessary to seek the nearest port, the vessel put into Norfolk. Before she could reach that port, she was obliged to throw over a part of her cargo, among which were 123 barrels of the flour covered by the policy. A part of the cargo which had been damaged was sold at Norfolk, among which were 30 additional barrels of the flour covered by the same policy. Having been repaired, the vessel left Norfolk, and eventually arrived at London. Of the 300 barrels shipped, 147 arrived at the port of delivery. These, the plaintiff, the assured, abandoned to the insurer, and claimed payment for a total loss. A verdict was found for the assured, subject, however, to the opinion of the court whether the assured were entitled to recover for a total or a partial loss. Van Ness, J., delivered the opinion. He said:

"The question here is, not whether the moiety of the whole cargo on board the ship was lost, but whether there has been a loss of a moiety of the property specifically insured by the plaintiff at any period of the voyage. * * * The contract between the parties is that the whole of the article insured shall be delivered at the port of destination; and if a moiety should be lost in the transportation, by a peril within the policy, the insurer is liable for a total loss. * * * Of the 300 barrels of flour insured, 123 were thrown overboard, and 30 barrels were so much damaged as to render a sale of them proper and necessary on the arrival of the ship at Norfolk. Not more than 147 barrels, therefore, arrived at the port of delivery. The 30 barrels sold at Norfolk were as much lost to the plaintiffs, within the meaning and spirit of the contract, as though they had been cast into the sea. They were lost to them, for all useful and intended objects of the shipment, inasmuch as they were not in a state fit to be carried to the market to which they were intended to be sent. The argument on the part of the defendants is that the

loss arising from the jettison, and the damaged flour' sold at Norfolk, esti-
mating the flour at prime cost, and crediting the money arising from the sale
of the 30 barrels of damaged flour, amounted to less than a moiety of the
prime cost of the whole 30 barrels; and that, therefore, there was not such
a loss as to authorize an abandonment. This argument, at first view, appears
plausible, but its fallacy is easily detected. The contract is not that there
shall be a delivery at London of a part of the property insured, and so much
money as will be equal to the moiety of the value of the 300 barrels. The
insurer undertook that the whole of the article insured should arrive at the
port of destination, and the insured have nothing to do with the money for
which the damaged goods were sold. The sale became necessary by reason
of an injury to the flour, for which the insurers are liable; and the proceeds
of the sale passed, by the abandonment, to the insurers."

It is claimed by counsel for respondent that there was no abandon-
ment in this case.  While it may be true that there was no abandon-
ment by the insured in the strict sense of that term, yet the substi-
tute adopted by the parties, viz. to settle all loss on the principles of
salvage loss, with benefit of salvage to the insurers, did away, ex vi
termini, with the necessity of an abandonment.  As is said by Stev-
ens, speaking of a salvage loss, supra:

"The principle of abandonment is assumed, and is in fact acted upon.
The property saved does not, indeed, actually belong to the insurers, as
where a regular abandonment is allowed, but it is to all intents and purposes
treated as if it did, and all the charges incurred are borne by them. The
principle acted on is this: The underwriter pays a total loss, and takes the
proceeds of the goods."

This would seem to be exactly the method of adjustment and set-
tlement which the insurer had in mind when he framed clause 3.

In the case of Forbes v. Insurance Co., 1 Gray, 371, the question
arose, whether the owner of goods covered by a policy of insurance,
and which had been jettisoned for the common benefit, could recover
of the underwriters, without first seeking contribution from the
other interests benefited by the jettison.  It was claimed by the
underwriters that the claim should be first satisfied from such con-
tributors, thus leaving a balance chargeable to the insurer, and that
the latter sum should be computed as the loss, and, if that method of
calculation were pursued, a loss would be shown of less than 50 per
cent., although the facts showed a gross loss of more than 50 per cent.
Judge Dewey answered this contention by saying:

"We do not, however, adopt this view, and, in the opinion of the court, the
assured may at once recur to the insurer for the loss of goods by jettison,
and he is not bound first to recur to the other owners for contribution to the
loss suffered for the common benefit. Goods lost by jettison may therefore
properly be taken into the estimate in making up the amount of more than
fifty per cent., necessary to authorize an abandonment."

The objection of respondent to the adjustment and settlement
of the loss on the principles of a salvage loss, on the ground that the
partial loss for which the insurer may become liable is based upon
50 per cent. of the sound value of the whole shipment at the port of
delivery, and not on the valuation in the policy, upon which a salvage
loss is to be ascertained, is not tenable if the view I take of the terms
of the contract be correct.  Clearly, the insurer may make any agree-
ment he pleases as to the terms of his liability, and fix a uniform

rule of valuation that will apply to all losses; and, it seems to me, that such has been the agreement in this policy.

The doctrine indicated as being applicable to this case appears to be in conformity with good reason and with the intention of the parties to the contract in the case under consideration. What did they intend? Did they mean to settle such partial loss as might occur upon the principles of a salvage loss, the right of recovery being limited to where the loss amounts to 50 per cent. on the sound value of the whole shipment at the port of delivery? Or did they intend that the 50 per cent. should be computed only on the net loss? For the reasons stated, I can but conclude that the former is the true construction of clause 3 of the policy, and one which, for reasons of justice and equity, should obtain in the present suit. A judgment will therefore be entered in favor of libelants for the stipulated sum of $1,110.80 and costs.